# 10-3270

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

VIACOM INTERNATIONAL INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, BLACK ENTERTAINMENT TELEVISION LLC,

*Plaintiffs-Appellants,*

v.

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

Paul M. Smith
William M. Hohengarten
Scott B. Wilkens
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000

Theodore B. Olson
Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Susan J. Kohlmann
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Stuart J. Baskin
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellants Viacom International Inc., Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television LLC, submit the following statement identifying their parent corporations and any publicly held corporation owning 10% or more of their stock:

Each of the Plaintiffs-Appellants is, directly or indirectly, a wholly-owned subsidiary of Viacom Inc., a company publicly traded on the New York Stock Exchange.  No publicly traded company owns 10% or more of the stock of Viacom Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................... 1

ISSUES PRESENTED ............................................................................ 4

STATEMENT OF THE CASE ................................................................ 5

STATEMENT OF FACTS ...................................................................... 6

    A.    The Digital Millennium Copyright Act .................................... 6

    B.    YouTube Builds A Business Based On Infringement ............. 8

    C.    YouTube's Infringement-Based Business Persists After Google Purchases YouTube ....................................................... 15

    D.    The District Court Proceedings ............................................. 17

SUMMARY OF ARGUMENT ............................................................. 19

ARGUMENT ....................................................................................... 22

    I.    The DMCA's Safe Harbor Does Not Protect YouTube's Intentional Facilitation Of Copyright Infringement ............ 22

        A.    YouTube's Failure To Take Action To Stop Infringing Activity Known To It Excludes YouTube From The DMCA Safe Harbor .............................................. 22

            1.    The Record Conclusively Demonstrates That YouTube Was *At Least* "Aware Of Facts Or Circumstances From Which  Infringing Activity Is Apparent" ................................................................. 23

            2.    YouTube's Willful Blindness To Its Users' Acts of Infringement Satisfies Even The District Court's Erroneous Requirement Of URL-Specific Knowledge .................................................................. 34

## Table of Contents
### (Continued)

Page

3.   Viacom Presented Evidence Sufficient To Raise A Genuine Question Of Fact That YouTube Had Actual Knowledge Of Identifiable Infringements ..........39

B.   YouTube's Profiteering From Its Users' Infringement Is Not Protected By The DMCA ..................................................40

C.   YouTube's Performance And Licensing Of User-Uploaded Copyrighted Content Are Not The Type Of Storage Activities That The DMCA Immunizes From Liability ..................................................49

II.   Viacom Is Entitled To Summary Judgment On Its Affirmative Claims ..................................................55

A.   Viacom Is Entitled To Summary Judgment On Its Direct Infringement Claim ..................................................55

B.   Viacom Is Entitled To Summary Judgment On Its *Grokster* Claim For Intentional Facilitation Of Infringement ..................................................57

C.   Viacom Is Entitled To Summary Judgment On Its Vicarious Liability Claim ..................................................60

CONCLUSION ..................................................61

# TABLE OF AUTHORITIES

**Cases**                                                        Page(s)

*A&M Records Inc. v. Napster*,
   239 F.3d 1004 (9th Cir. 2001) ............................................................ 44, 47, 48, 49

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
   239 F.3d 619 (4th Cir. 2001) ........................................................................ 7, 29

*Arista Records LLC v. Lime Group LLC*,
   715 F. Supp. 2d 481 (S.D.N.Y. 2010) ............................................................ 48, 58

*Arista Records LLC v. USENET.com, Inc.*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) .................................................. 30, 43, 57, 58

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) .................................................................................34

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ..............................................................................................53

*Barnhart v. Sigmon Coal Co.*,
   534 U.S. 438 (2002) ..............................................................................................26

*Cartoon Network LP v. CSC Holdings, Inc.*,
   536 F.3d 121 (2d Cir. 2008) .................................................................................57

*Coach Leatherware Co. v. AnnTaylor, Inc.*,
   933 F.2d 162 (2d Cir. 1991) .................................................................................22

*Columbia Pictures Indus., Inc. v. Fung*,
   No. CV 06-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009)................... 29, 58

*Conn. ex rel. Blumenthal v. U.S. Dep't of the Interior*,
   228 F.3d 82 (2d Cir. 2000) ...................................................................................27

*Conn. Hosp. Ass'n v. Weicker*,
   46 F.3d 211 (2d Cir. 1995) ...................................................................................22

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ..............................................................................................27

**Table of Authorities**
**(Continued)**

Page(s)

*Costar Group, Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004) .... 43, 49

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) .................................................................42

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) ..............................................................50

*First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co.*,
  385 U.S. 252 (1966) .............................................................................28

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) ........................................................... 47, 60

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
  443 F.2d 1159 (2d Cir. 1971) ................................................................60

*Giordano v. Mkt. Am., Inc.*,
  599 F.3d 87 (2d Cir. 2010) ...................................................................22

*Green v. Bock Laundry Mach. Co.*,
  490 U.S. 504 (1989) .............................................................................30

*Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*,
  955 F.2d 1143 (7th Cir. 1992) ...............................................................35

*Hibbs v. Winn*,
  542 U.S. 88 (2004) ...............................................................................42

*Holmes v. Sec. Investor Prot. Corp.*,
  503 U.S. 258 (1992) .............................................................................53

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (7th Cir. 2003) ............................................................. 7, 34

*Kalem Co. v. Harper Bros.*,
  222 U.S. 55 (1911) ...............................................................................29

**Table of Authorities**
**(Continued)**

Page(s)

*Matthew Bender & Co. v. W. Publ'g Co.*,
  158 F.3d 693 (2d Cir. 1998) ............................................................42

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) ............................................................58

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005) .................................................................. *passim*

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
  454 F. Supp. 2d 966 (C.D. Cal. 2006).................................... 58, 59, 60

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir. 1997) ............................................................31

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................................43

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007).................................................... *passim*

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  907 F. Supp. 1361 (N.D. Cal. 1995)..................................................57

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
  316 F.2d 304 (2d Cir. 1963) ...................................................... 43, 47

*Tasini v. N.Y. Times Co.*,
  206 F.3d 161 (2d Cir. 2000), *aff'd*, 533 U.S. 483 (2001) ...................55

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010) ..............................................................35

*Tiffany (NJ) Inc. v. eBay, Inc.*,
  576 F. Supp. 2d 463 (S.D.N.Y. 2008), *aff'd*, 600 F.3d 93 (2d Cir. 2010).... 35, 36

*United States v. Aina-Marshall*,
  336 F.3d 167 (2d Cir. 2003) ...................................................... 35, 39

**Table of Authorities**
**(Continued)**

Page(s)

*United States v. Cleveland Indians Baseball Co.*,
532 U.S. 200 (2001) ...................................................................47

*United States v. MacPherson*,
424 F.3d 183 (2d Cir. 2005) .......................................................39

**Statutes**

17 U.S.C. § 106 ................................................................... 55, 56

17 U.S.C. § 512 ................................................................... 53, 54

17 U.S.C. § 512(a) .....................................................................54

17 U.S.C. § 512(b) .....................................................................54

17 U.S.C. § 512(c) ................................................................ *passim*

17 U.S.C. § 512(d) .............................................................. 53, 54

17 U.S.C. § 512(m) ......................................................... 38, 46, 47

17 U.S.C. § 512(n) .....................................................................54

28 U.S.C. § 1291 ..........................................................................4

28 U.S.C. § 1331 ..........................................................................4

28 U.S.C. § 1338 ..........................................................................4

**Other Authorities**

3 *Nimmer on Copyright*
§ 12B.04[A][2] (2001)...............................................................43

H.R. Rep. No. 105-551(I) (1998).............................................. 7, 42

H.R. Rep. No. 105-551(II) (1998) ........................................ *passim*

**Table of Authorities**
**(Continued)**

Page(s)

Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats: Reckoning the Future Business Plans of Copyright-Dependent Technology Entrepreneurs*, 50 Ariz. L. Rev. 577 (2008) ......................................... 26, 33, 49

Jane C. Ginsburg, *User-Generated Content Sites and Section 512 of the U.S. Copyright Act*, Copyright Enforcement and the Internet 183 (Irini A. Stamatoudi ed., 2010) ........................................................................... 25, 26, 38

S. Rep. No. 105-190 (1998) ........................................................................ *passim*

## **INTRODUCTION**

YouTube bills itself as "the world's most popular online video community, allowing millions of people to discover, watch and share originally-created videos." YouTube, About YouTube, http://www.youtube.com/t/about. But from the time that YouTube launched in December 2005 until 2008 (well after this litigation began), many of the videos that users "discover[ed], watch[ed], and share[d]," on YouTube were not their own home movies, but rather were "originally-created" by Viacom—and protected by the U.S. copyright laws.

Almost immediately after YouTube came online, YouTube became aware of widespread infringement on its site. And it was the copyrighted videos—not home movies—that people flocked to YouTube to see. Indeed, in an internal email, YouTube acknowledged that if YouTube "just remove[d] the obviously copyright infringing stuff," traffic would "go from 100,000 views a day down to about 20,000 views or maybe even lower." JAII-159-60.[1]

At this point, YouTube faced a stark choice: Like its competitor Google Video, it could screen uploaded videos for unauthorized copyrighted content and

---

[1] References herein to the "JA" identify the volume and page numbers where the cited material appears in the six-volume joint appendix filed by the parties; *e.g.*, JAI-5 refers to volume I, page 5 of the joint appendix. References to the special appendix are designated as "SPA," followed by the page number on which the cited material appears.

build its business on content that it had the legal right to reproduce, display, per-form, and distribute.  Or it could attempt to grow its business more rapidly by dis-playing and performing the copyrighted creations of others without authorization. It chose the latter course, stating "we need to attract traffic."  JAII-171.

On these facts, there is no room to dispute the district court's view that YouTube "not only w[as] generally aware of, but welcomed, copyright-infringing material being placed on [its] website" because "[s]uch material was at-tractive to users" and "enhanced [YouTube's] income from advertisements." SPA9.  Indeed, before Google bought YouTube for $1.65 billion, Google's own due diligence team warned that *more than half* of YouTube's views infringed copyrights.  And the scope of the ongoing infringement was so broad—and the value to Google of that infringement so great—that at one point, Google offered Viacom a deal to license Viacom's copyrights that Google valued at a minimum of $590 million.  JAI-302.

The district court nevertheless held that YouTube had *no* liability for the rampant infringement of copyrights it "welcomed."  To reach that implausible con-clusion, the district court held that the narrow safe harbor established by Section 512(c) of the Digital Millennium Copyright Act, 17 U.S.C. § 512(c), shields *any* infringing activity ("however flagrant and blatant") that "flow[s] from" a user's up-load of copyrighted material to a website, and is unavailable to a service provider

2

*only* when a copyright owner can demonstrate that the service provider has actual knowledge of "specific and identifiable infringements of individual items," including the "works' locations at the site," which is to say, actual knowledge that the material appearing at a specific URL (web address) infringes a copyright. SPA10, 20, 27, 32. Absent proof that a service provider possessed this type of URL-specific knowledge, the service provider's responsibility under the copyright laws was limited to timely responding to cease-and-desist demands of copyright owners, *even if* the service provider already was "aware[] of pervasive copyright-infringing." SPA20.

If affirmed by this Court, that construction of Section 512(c) would radically transform the functioning of the copyright system and severely impair, if not completely destroy, the value of many copyrighted creations. It would immunize from copyright infringement liability even avowedly piratical Internet businesses. Even the very piratical businesses held to account in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), could be immune with just minor tweaks to their business models.

Nothing in the text or history of the DMCA even remotely suggests that Congress intended such absurd, disquieting, and disruptive results. In fact, the text of the DMCA compels the opposite conclusion: Internet service providers that not only are aware of pervasive copyright infringement, but actively participate in and

3

profit from it, enjoy no immunity from the copyright laws and may be held to account for their theft of artists' creations.   Once YouTube is stripped of Section 512(c) immunity, well-established principles of copyright law and the summary judgment record dictate that YouTube be held liable for the rampant copyright infringement that, even on the district court's telling, YouTube "welcomed."

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

YouTube's founders built an integrated media entertainment business, in the district court's words, by "welcom[ing] copyright-infringing material being placed on their website."   That copyrighted material was "attractive to users" and "enhanced defendants' income from advertisements," enabling YouTube's founders to sell the business to Google for $1.65 billion.   The district court nevertheless held, on summary judgment, that Section 512(c) of the DMCA precluded any liability for copyright infringement.   The questions presented are:

1. Whether, viewing the evidence in the light most favorable to Viacom, there is at least a genuine dispute of fact that YouTube's practice of welcoming copyright infringement places it outside the safe harbor of 17 U.S.C. § 512(c) because:

4

    a. YouTube had "actual knowledge" that material on YouTube was infringing, or alternatively, was "aware of facts or circumstances from which infringing activity [wa]s apparent" and took no action to stop it; *or*

    b. it "receive[d] a financial benefit directly attributable to the infringing activity" that it had "the right and ability to control"; *or*

    c. YouTube's acts of infringement encompassed activities beyond mere "storage" of infringing materials.

2. Whether the undisputed evidence demonstrating that YouTube had both directly infringed Viacom's copyrights and "welcomed" (and profited greatly from) its users' acts of infringement entitled Viacom to summary judgment on its claims for relief.

## STATEMENT OF THE CASE

Plaintiffs-Appellants (collectively, "Viacom"), own the copyrights in thousands of popular movies and television shows that were uploaded, reproduced, displayed, performed, and distributed without authorization on the YouTube website, which is operated by Defendants-Appellees Google, Inc., YouTube, Inc., and YouTube, LLC (collectively, "YouTube"). Viacom brought this copyright action against YouTube in the United States District Court for the Southern District of

New York (Stanton, J.) to recover for YouTube's rampant infringement of Viacom's copyrighted works.

YouTube asserted an affirmative defense under Section 512(c) of the DMCA. After fact discovery, YouTube moved for summary judgment on its affirmative defense under the DMCA. Viacom cross-moved for partial summary judgment on YouTube's affirmative defense, and also on liability for direct infringement, induced infringement, and vicarious infringement. The district court granted YouTube's motion, denied Viacom's, and entered final judgment in favor of YouTube. SPA33.

## STATEMENT OF FACTS

### A.   The Digital Millennium Copyright Act

In 1998, as the Internet was first coming into widespread use, Congress sought to "keep pace with emerging technology" by addressing the application of certain copyright laws in the digital age. S. Rep. No. 105-190, at 2 (1998). "Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously," Congress became concerned that "copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy." *Id*. at 8. On the other hand, firms that served as the "backbone" for the Internet were concerned that they could be subjected to unavoidable copyright infringement liability if their

customers used Internet facilities to infringe.  H.R. Rep. No. 105-551(I), at 11 (1998); *see also In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (noting Congress's intent to address "the vulnerability of Internet service providers such as AOL to liability for copyright infringement as a result of file swapping among their subscribers").

Congress sought to strike a balance among these competing concerns in Section 512(c) of the DMCA by providing Internet service providers with "greater certainty . . . concerning their legal exposure for infringements that may occur in the course of their activities" while at the same time preserving  "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements."  H.R. Rep. No. 105-551(II), at 49-50 (1998).  Congress accomplished this objective by crafting a safe harbor for "'innocent' service providers" that "disappears at the moment the service provider loses its innocence." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001).

Section 512(c) excludes a provider of storage services from the safe harbor if it obtains either "actual knowledge that the material or an activity using the material on the system or network is infringing" or "in the absence of such actual knowledge . . . aware[ness] of facts or circumstances from which infringing activity is apparent" and then, in either case, fails to "act[] expeditiously to remove, or disable access to, the material."  17 U.S.C. § 512(c)(1)(A).  Under this provision, a

service provider that has no knowledge of infringing activity is shielded from liability, but "if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the limitation of liability if it takes no action.'" H.R. Rep. No. 105-551(II), at 53.

Congress also incorporated established principles of vicarious infringement liability into the safe harbor, excluding from its protection any service provider that "receive[s] a financial benefit directly attributable to the infringing activity" if the provider had "the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Under this provision, if "the value of the service lies in providing access to infringing material," the DMCA excludes the provider from the safe harbor. H.R. Rep. No. 105-551(II), at 54.

### B.    YouTube Builds A Business Based On Infringement

In 2005, three former employees of the Internet payments company PayPal founded YouTube with hopes of replicating the financial success of PayPal, which eBay purchased in 2002 for $1.3 billion. YouTube was to be a "consumer media company" operating over a website (www.youtube.com). JAI-258. The content for YouTube would be provided primarily by its users, who would be invited to upload videos onto the website so long as they granted YouTube an unrestricted "worldwide . . . license to use, reproduce, distribute, prepare derivative works of, display, and perform the [video] . . . in any media formats and through any media

8

channels." JAI-96, 336; *see also Viacom Int'l Inc. et al v. YouTube, Inc. et al*, No. 1:07-cv-02103-LLS, Docket (S.D.N.Y.) (hereinafter ("DCt.R.")), Dkt.No.210, Ex. 118. Once a video was uploaded, YouTube made it available to the entire YouTube audience, which could watch the video on YouTube's website, along with advertisements YouTube ran alongside the video. The goal, as one of the founders observed, was to make YouTube "just like TV," with users "who keep coming back," and advertisers who pay for access to that audience. JAII-156. YouTube accordingly assumed complete editorial control over the site, including by reserving and exercising the right to terminate user accounts or remove "content at [its] sole discretion for any reason whatsoever" and by requiring that uploaders provide a license to YouTube to sublicense uploaded material. JAI-317-18.

YouTube's three founders aimed to quickly establish—and cash in on— YouTube's popularity. JAII-191 ("our dirty little secret . . . is that we actually just want to sell out quickly"). To do that, however, YouTube needed to build its audience faster than its competitors. To this end, YouTube's founders applied a no-holds-barred approach, with one exhorting his colleagues to "concentrate all of our efforts in building up our numbers as aggressively as we can through whatever tactics, however evil." JAI-832.

From the outset, YouTube's founders knew that vast quantities of infringing videos were attracting traffic to the site. As early as June of 2005, YouTube's

Internet service provider complained that YouTube was violating its user agree-
ment by, YouTube founder Steve Chen believed, "hosting copyrighted content."
JAII-152.  But Chen resolved that YouTube was "not about to take down content
because our ISP is giving us shit."  *Id*.  And, in emails with the other founders, he
later remarked "we need to attract traffic. . . .  [T]he only reason why our traffic
surged was due to a video of this type"—*i.e.*, copyrighted and unauthorized.  JAII-
171.  Maryrose Dunton, YouTube's lead product manager, was even more explicit,
acknowledging that "probably 75-80% of our views come from copyrighted mate-
rial."  JAII-47.  Chen agreed that even removal of only the "obviously copyright
infringing stuff" would reduce views "from 100,000 views a day down to about
20,000 views or maybe even lower."  JAII-159-60.

The availability of unauthorized copyrighted material was a significant part
of the reason YouTube trounced its competitor Google Video in the race to build
an audience.  As the Google Video team explained, "[a] large part of [YouTube's]
traffic is from pirated content. . . . [W]e are comparing our 'legal traffic' to their
mix of traffic from legal and illegal conduct."  JAI-540.

In the wake of the Supreme Court's decision in *Metro-Goldwyn-Mayer Stu-
dios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), condemning intentional facilita-
tion of infringement over the Internet, YouTube founder Chad Hurley emailed the
others:  "[W]e need views, [but] I'm a little concerned with the recent [S]upreme

10

[C]ourt ruling on copyrighted material." JAII-162. Chen also recognized that the company would have "a tough time defending the fact that we're not liable for the copyrighted material on the site because we didn't put it up when one of the co-founders is blatantly stealing content from anther site and trying to get everyone to see it." JAII-164. Hurley ultimately advised his colleagues to "save your meal money for some lawsuits!" JAII-157.

Unwilling to risk losing its illicitly acquired audience, YouTube imple-mented a policy of maintaining access to infringing videos unless and until it re-ceived a "cease and desist" demand from the copyright owner. Using the example of a clip pirated from CNN, one of YouTube's founders outlined how this policy would ensure a supply of infringing clips:

> i really don't see what will happen. what? someone from cnn sees it? he happens to be someone with power? he happens to want to take it down right away. he gets in touch with cnn legal. 2 weeks later, we get a cease & desist letter. we take the video down.

JAII-173.

Through this strategy, YouTube would get the benefit of the current, news-making copyrighted videos that attracted viewers, and would take them down only if they were discovered by the copyright owner and then only after their attractive-ness to the audience had long since faded. And if a video's "virality" had not yet ebbed, another user could be counted on to upload yet another infringing copy.

11

To lend credence to its policy of relying exclusively on owner-provided notices of infringement, YouTube sought to cut itself off from information about the rampant infringement on its website. YouTube includes a community flagging feature that plays a critical role in excluding inappropriate videos from the site; YouTube urges users to flag for YouTube's attention videos that violate YouTube's terms of use (e.g. pornography). When it launched this feature in September 2005, YouTube also included the capacity for users to flag a video as "copyrighted." YouTube's founders initially believed that permitting the community to flag copyrighted material created "the perception . . . that we are concerned about this type of material and we're actively monitoring it." JAII-176. But Hurley soon ordered the feature's removal "asap," reasoning, "we are starting to see complain[t]s for this and basically if we don't remove [the feature] we could be held liable for being served a notice." JAII-177.

Dunton similarly put a stop to efforts to implement software that would notify copyright owners when infringing videos were uploaded. Even though a YouTube engineer said that implementing an automated anti-infringement tool to alert copyright owners when suspected infringing content was uploaded "isn't hard" and would "take another day or [weekend]," Dunton ordered the engineer to "forget about the email alerts stuff" because "we're just trying to cover our asses so we don't get sued." JAII-112-13.

12

YouTube likewise rejected the Motion Picture Association of America's ("MPAA") request to implement digital fingerprint filtering technology to block copyrighted content in the upload process, and offered such technology to Viacom only as part of a licensing deal. JAII-633-35. Fingerprint filtering technology enables a service provider to instantaneously and automatically compare a digital fingerprint, a unique digital identifier of an audio or visual work, to a database of digital fingerprints of copyrighted works provided by copyright holders and, in the event of a match, block the upload or flag it for review. JAI-322-23. In 2006, digital fingerprint filtering technology was commercially available, reliable, and relatively inexpensive; and, in fact, YouTube had a license to use the software of industry leader Audible Magic. After indicating willingness to filter for the MPAA's copyrighted material, YouTube later backtracked, stating in a phone call among co-founder Chen, YouTube's general counsel, and a MPAA representative that "the copyrighted content on YouTube was a major lure for their users." JAII-634.

In the absence of community flagging or fingerprint filtering, YouTube believed the copyright holder would be "responsible for serving us notice of the material" before YouTube could be charged with an obligation to remove it. JAII-177. This policy proved effective in preserving YouTube as a destination for viewing copyrighted videos that were posted without authorization. In February

13

2006, Dunton reported to YouTube co-founder Steve Chen that she "did a little ex-
ercise on friday and went through all the most viewed/most discussed/top favor-
ites/top rated [videos on YouTube] to try and figure out what percentage is or has
copyrighted material.  it was over 70%."  JAI-857.

And, one month later, another YouTube co-founder, Jawed Karim, informed
the Board of Directors that "blatantly illegal" material was present on the site:

> As of today episodes and clips of the following well-known shows
> can still be found:  Family Guy, South Park, MTV Cribs, Daily Show,
> Reno 911, Dave Chapelle. . . .  [W]e would benefit from *preemptively*
> removing content that is blatantly illegal and likely to attract criticism.
> This will help to dispel YouTube's association with Napster (News-
> week:  "Is YouTube the Napster of Video?" . . . ).

JAII-183.  The copyrights in all but one of the "well-known shows" identified by
Karim are owned by Viacom.  In all, the undisputed facts established that over
3,000 Viacom works were reproduced without authorization (in many cases, mul-
tiple times) on YouTube's website.  JAI-256-57.

The extensive evidence of YouTube's awareness of the extent of infringe-
ment on the site is even more remarkable given that almost none of these key in-
ternal documents were produced by YouTube, which claimed to retain very few
responsive documents.  DCt.R., Dkt.No.191 ¶ 263.  For example, Hurley testified
that he had "lost" all of his YouTube e-mails for the key time period of this case,
JAII-294, while Google CEO Eric Schmidt testified that even though he uses and
e-mails from "probably 30" different computers, he retains no e-mails and his

14

search for responsive e-mails yielded 19 documents for the key time period. DCt.R., Dkt.No.191 ¶¶ 348, 266. Only Karim, who left YouTube in 2006, preserved these materials on his own personal computer and produced these critical documents.

### C. YouTube's Infringement-Based Business Persists After Google Purchases YouTube

Unable to compete with YouTube's pirated content, in late 2006, Google bought YouTube for $1.65 billion. Google's due diligence confirmed that the business it was purchasing was, indeed, built on copyright infringement. In their written presentation to Google's board and senior management, Google's financial advisors stated that 60 percent of YouTube's views were "premium" —*i.e.*, copyrighted—and only 10 percent of the premium videos were licensed. JAII-228. But instead of purging YouTube of infringing content, Google embraced YouTube's policy of retaining infringing videos unless and until the copyright owner detected it and served a cease-and-desist demand. JAI-298. Indeed, a post-acquisition "YouTube Content Policy Training" manual even highlighted Viacom's *Daily Show* as an example of content to "Approve" when reviewing videos for terms-of-use violations. JAI-271. With YouTube's vast library of copyrighted videos, Google hoped "to grow playbacks to 1B/day." JAI-298.

With infringement of its members' works growing exponentially, the MPAA again pressed YouTube (and its new owners) to implement commercially available

fingerprint filtering technology to control infringement on the YouTube site. YouTube eventually signaled willingness to implement Audible Magic. But this offer came with a catch: As Google's Vice President of Content Partnerships explained, the "Claim Your Content" tool that included Audible Magic would be offered "only . . . to partners who enter into a revenue deal with us." JAI-817. In February 2007, YouTube told the MPAA and Viacom that it would not use Audible Magic to prevent copyright infringement unless Viacom agreed to a license deal. JAII-673-74. In other words, unless copyright owners agreed to YouTube's terms, YouTube would simply allow controllable infringement to continue.

After months of negotiation, YouTube had offered Viacom a package YouTube valued at a minimum of $590 million for a license to Viacom's works that included an explicit promise to use fingerprint filtering technology to block Viacom's copyrighted works not subject to the license. JAI-302. Ultimately, those negotiations broke down, leaving Viacom with no alternative but to send YouTube take-down notices for more than 100,000 infringing clips of thousands of distinct programs. Viacom filed the present suit in March 2007, alleging that "tens of thousands of videos on YouTube, resulting in hundreds of millions of views, were taken unlawfully from Viacom's copyrighted works without authorization," SPA9-10, and that YouTube "failed to employ reasonable measures that

could substantially reduce, or eliminate, the massive amount of copyright in-
fringement on the YouTube site from which YouTube directly profits," JAI-223.

### D.    The District Court Proceedings

In ruling on the parties' cross motions for summary judgment, the district
court acknowledged that "a jury could find that the defendants not only were gen-
erally aware of, but welcomed, copyright-infringing material," and that the infring-
ing material "was attractive to users," and "enhanced defendants' income from ad-
vertisements." SPA9.  It nevertheless granted YouTube's motion, concluding that
the safe harbor entitled YouTube to protection "against all of plaintiffs' claims for
direct and secondary copyright infringement." SPA33.

Reasoning from the "tenor" of the legislative history, the district court con-
cluded that the alternative safe harbor exclusions for "actual knowledge that the
material . . . is infringing" (17 U.S.C. § 512(c)(1)(A)(i)) or "aware[ness] of facts or
circumstances from which infringing activity is apparent" (*id.* § 512(c)(1)(A)(ii))
*both* require "knowledge of specific and identifiable infringements of particular in-
dividual items," including "the works' locations at the site." SPA18, 32.
"[A]wareness of pervasive copyright infringing, however flagrant and blatant," the
district court ruled, "is not enough" to exclude a service provider from the statutory
safe harbor.  SPA18, 20.  The district court concluded on summary judgment
that YouTube had never obtained actual knowledge of "specific instances of in-

fringement" other than through Viacom's take-down notices and that YouTube responded adequately once it received those notices.

The district court likewise rejected Viacom's alternative arguments for excluding YouTube from the Section 512(c) safe harbor.  Addressing Section 512(c)(1)(B)'s requirement that the service provider "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity," the district court held that, as a matter of law, YouTube could not have the "right and ability to control" its users' infringing activities unless it had "item-specific" knowledge of the users' acts of infringement.  SPA28.

Finally, it concluded that YouTube's self-described acts of "broadcasting"—including numerous undisputed acts of display, performance, and distribution of Viacom's copyrighted works—all were "by reason of the storage at the direction of a user" within the meaning of Section 512(c)(1).  "[T]o meet the statute's purpose," the district court construed this phrase to include all acts of infringement that "flow from the material's placement on the provider's system."  SPA26-27.  Thus, the district court included within the statutory safe harbor activities it deemed to be within the "collateral scope of 'storage'" and "allied functions," including, for example, YouTube's downstream licensing of copyrighted content to

18

third parties such as Verizon for subdistribution to its mobile telephone subscribers.  SPA28.

## SUMMARY OF ARGUMENT

I.     In order to claim the protection of the safe harbor of Section 512(c) of the DMCA, a service provider must meet, as relevant here, each of three requirements:  (1) the service provider must promptly remove or disable access to infringing material upon obtaining actual knowledge of infringement or awareness of facts or circumstances making such infringement apparent; (2) the service provider must not receive a financial benefit directly attributable to the infringing activity, if the service provider has the right and ability to control such activity; and (3) the service provider's involvement in the infringement must be limited to "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  YouTube fails to satisfy *any* of these requirements, much less all of them.

A.     As the district court recognized, a jury could find not only that YouTube was "generally aware of . . . copyright-infringing material" on its website, but indeed that it "welcomed" such material.  SPA9.  The plain language of the statute and its accompanying legislative history demonstrate that the district court erred in holding that YouTube nonetheless could claim entitlement to the safe harbor simply because it purportedly lacked knowledge of the specific URL of

19

each individual infringing video.  The district court's error is all the more clear given that there is ample evidence to suggest that YouTube did, indeed, have such item- and location-specific information with respect to at least some works.  And it is only because it intentionally blinded itself to that information by disabling its own community flagging feature and by selectively implementing commercially-available fingerprint filtering solutions that it might not have had such specific information with respect to *all* of Viacom's works.  In any event, the record evidence that YouTube "welcomed" "blatant" infringement, that well more than half of its "views" were of infringing material, and that YouTube intentionally facilitated its users' rampant infringement collectively demonstrates *at least* that YouTube was "aware of facts or circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(1)(A)(ii).

B.  YouTube also may not claim an entitlement to the safe harbor because it "receive[d] a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  YouTube purposefully (and successfully) sought advertising revenue by facilitating performances of popular copyright-infringing material.  YouTube's own general counsel even acknowledged that such material was a "major lure" for their users.  Moreover, YouTube explicitly retained the right to remove uploaded videos, and available technology would have en-

20

abled YouTube to easily find and remove the infringing material. Section 512(c)(1)(B) accordingly excludes YouTube from the safe harbor.

C.  The safe harbor applies only to infringement that occurs "by reason of the storage at the direction of a user" of infringing material. YouTube provides far more than user-directed "storage"; YouTube displays, reproduces, performs, and licenses the infringing material as part of its self-described "broadcast" business. It also actively seeks to guide viewers to videos, including infringing videos, that may interest them. This active involvement in infringement distinguishes YouTube from the passive provider of storage that the safe harbor is intended to protect, and disqualifies it from the safe harbor's protection.

II.  For the same reasons YouTube is excluded from the safe harbor, Viacom is entitled to summary judgment on its affirmative claims. YouTube's display, reproduction, performance, and distribution of copyrighted material constitute direct infringement. Moreover, by intentionally inducing infringement, YouTube incurs secondary liability regardless of whether it has item-specific knowledge. *See Grokster*, 545 U.S. 913. Finally, just as YouTube's receipt of a "financial benefit" from activity it had the "right and ability to control" defeats application of the safe harbor, it also subjects YouTube to vicarious liability.

## ARGUMENT

### I. The DMCA's Safe Harbor Does Not Protect YouTube's Intentional Facilitation Of Copyright Infringement

This Court reviews the district court's grant of summary judgment *de novo*. *Conn. Hosp. Ass'n v. Weicker*, 46 F.3d 211, 216 (2d Cir. 1995). Summary judgment is proper only where no reasonable jury, "while resolving ambiguities and drawing reasonable inferences against the moving party . . . could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). This standard applies "whether summary judgment is granted on the merits or on an affirmative defense." *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010). Because YouTube failed to establish beyond genuine dispute *all* the required elements of its affirmative defense, YouTube's motion for summary judgment should have been denied.

Indeed, undisputed facts here demonstrate that YouTube cannot satisfy any of the elements of its affirmative defense, and thus summary judgment should be awarded to *Viacom* on YouTube's DMCA defense.

### A. YouTube's Failure To Take Action To Stop Infringing Activity Known To It Excludes YouTube From The DMCA Safe Harbor

YouTube must be excluded from the DMCA's safe harbor if it obtained either "actual knowledge" of infringing material or "aware[ness] of facts or circumstances from which infringing activity is apparent," yet failed to take action "expeditiously to remove, or disable access to, the [infringing] material." 17 U.S.C.

§ 512(c)(1)(A).  There is no dispute that, for years, YouTube's policy and practice was to take *no action* to remove infringing material unless and until the copyright owner provided YouTube with a DMCA-compliant take-down notice and then to construe such a notice narrowly to retain infringing clips not specifically identified. The primary issue before the district court—and now this Court—is whether, in light of YouTube's undisputed knowledge or awareness of ongoing infringement, this no-action policy properly excludes it from the safe harbor.  The district court erred in holding that Viacom had failed to raise a genuine question of fact on that issue.  Quite to the contrary, the undisputed evidence—and even the district court's opinion—compels the conclusion that YouTube had, *at least*, disqualifying aware-ness of facts evidencing massive, blatant, and rampant infringement.

### 1. The Record Conclusively Demonstrates That YouTube Was *At Least* "Aware Of Facts Or Circumstances From Which Infringing Activity Is Apparent"

After reviewing the parties' voluminous summary judgment submissions, the district court concluded that "a jury could find that the defendants not only were generally aware of, but welcomed, copyright-infringing material being placed on their website."  SPA9.  That conclusion is amply supported by the record.  Via-com presented voluminous evidence, from the mouths of YouTube's own founders and managers, that YouTube's management and even its Board of Directors were

23

told that most of YouTube's "views" were acts of infringement and that YouTube was continuously infringing several specific Viacom-owned works.

YouTube's founders nonetheless justified keeping the "obviously copyright infringing stuff" by noting that "we can presumably claim that we don't know who owns the rights to that video and by uploading, the user is claiming they own that video." JAII-159-60. Shortly thereafter, YouTube's founders and other high-level executives stated that 70-80 percent of YouTube's viewership was based on infringing material. JAII-47; *see also* JAII-159-60. For example, Lead Product Manager Maryrose Dunton commented that 70 percent of the "most viewed/most discussed/top favorites/top rated" list consisted of copyrighted materials. JAI-857. Google reached a similar conclusion during its pre-acquisition due diligence of YouTube, with its financial advisor Credit Suisse reporting that 60 percent of the video views on YouTube were protected by copyright and only 10 percent of the video views of copyrighted materials were licensed. JAII-228. Even one of YouTube's founders was uploading copyrighted material to YouTube's site, and later was able to point the Board of Directors to numerous specific examples of infringing material, including "South Park, MTV Cribs, Daily Show, Reno 911, Dave Chapelle"—all owned by Viacom. JAII-164; JAII-183.

The *only* inference that can be drawn from the evidence in this case is that YouTube *knew* of the infringing activity on its site and therefore had at least

"aware[ness] of facts or circumstances from which infringing activity is apparent."

17 U.S.C. § 512(c)(1)(A).[2]

Yet, the district court concluded that, as a matter of law, YouTube lacked statutory "aware[ness] of facts or circumstances from which infringing activity [was] apparent," even if it indisputably was aware that more than half of its views were infringing. Disqualifying awareness, the district court held, required "knowledge of specific and identifiable infringements of particular individual items," including "the works' locations at the site"—knowledge that the district court ruled YouTube did not obtain except through Viacom's take-down notices. SPA18, 32. This construction is manifestly contrary to the text, structure, and history of the statute.

---

[2] That a relatively small number of Viacom's works on YouTube were authorized by Viacom for promotional purposes is of no moment. YouTube indisputably was aware that most of Viacom's works on YouTube were infringing. *See* JAII-183 (alerting the board of directors to "blatantly illegal" infringement, including episodes of "Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, Dave Chapelle . . ."). At most, Viacom's promotional use of YouTube would create an issue for trial whether YouTube, in the face of its awareness of the rampant infringement of Viacom's works, "act[ed] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A)(iii); *see also* Jane C. Ginsburg, *User-Generated Content Sites and Section 512 of the U.S. Copyright Act, in* Copyright Enforcement and the Internet 183, 193 (Irini A. Stamatoudi ed., 2010) ("Infringement may be 'apparent' yet subject to verification (or contradiction)."). But, in this case, even that argument would be makeweight. Viacom offered to identify any authorized clips, but YouTube refused all assistance in this respect. JAII-192-94, JAII-634.

The district court emphasized legislative history in construing the safe harbor, but it is well-settled that statutory construction must begin with the statutory language. *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). And the statutory language here provides no support whatsoever for the district court's requirement of item- and location-specific knowledge. To the contrary, the "aware[ness]" exclusion denies the safe harbor upon awareness of "facts or circumstances" that make "infringing activity" "apparent." 17 U.S.C. § 512(c); *see also* Jane C. Ginsburg, *Separating the* Sony *Sheep from the* Grokster *Goats: Reckoning the Future Business Plans of Copyright-Dependent Technology Entrepreneurs*, 50 Ariz. L. Rev. 577, 598 (2008) (("'[A]pparent' does not mean 'in fact illegal,' nor does it mean 'conclusively exists.'").

Congress's use of the encompassing term "facts or circumstances" demonstrates its intention that the "aware[ness]" exclusion not be limited to those holding one particular type of knowledge. Rather, Congress clearly signaled its intention to trigger this exclusion whenever one encounters *any* combination of "facts or circumstances" sufficient to raise a "red flag" warning the service provider that it is likely hosting acts of infringement. S. Rep. No. 105-190, at 44. And the flexible character of this exclusion is further confirmed by Congress's choice to trigger the exclusion once "infringing *activity*"—not particular and identifiable acts of infringement—becomes apparent. *See* Ginsburg, *User-Generated Content Sites*, *su-*

*pra* n.2, at 190-93. Indeed, requiring item-specific, location-specific knowledge to establish "aware[ness] of facts or circumstances from which infringing activity is apparent," converts the awareness exclusion into a superfluity, because it would be satisfied only when the "knowledge" exclusion also is satisfied. And it strips the statutory phrase "in the absence of such actual knowledge" of any meaning at all. The superfluity can be avoided and each statutory phrase can be given independent meaning by interpreting "awareness" as a lesser-included alternative to "actual knowledge." And it is "well established" that where a statute can be interpreted to avoid superfluity and abnegation of statutory text it must be so interpreted. *Conn. ex rel. Blumenthal v. U.S. Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000) ("[W]e are required to 'disfavor interpretations of statutes that render language superfluous.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992))).

By requiring item-specific knowledge to establish *either* knowledge *or* awareness, the district court also contravened the structure of the statute. The district court's construction of the safe harbor essentially requires copyright owners to send formal take-down notices to trigger a service provider's obligation to expeditiously remove infringing material. This, clearly, was how the district court viewed the safe harbor. *See* SPA26 ("[W]hen YouTube was given the notices, it removed the material. It is thus protected . . . ."). Yet, the safe harbor requires that a service provider promptly remove infringing material after obtaining knowledge

27

or awareness of facts or circumstances from which *infringement is apparent*, not just after receipt of a formal take-down notice.  *See* 17 U.S.C. § 512(c)(1)(A)(iii), (c)(1)(C); *see also* H.R. Rep. No. 105-551(II), at 54 ("Section 512 does not specifically mandate use of a notice and take-down procedure.").  Knowledge or awareness of infringing activity triggers the service provider's obligation to remove the materials, "*even if the copyright owner or its agent does not notify it of a claimed infringement.*"  *Id.* (emphasis added).  The district court's view that a take-down notice is required to trigger removal obligations thus cannot be reconciled with the statutory scheme Congress enacted.

Nor can it be reconciled with one of the central purposes of the DMCA. Congress enacted the DMCA precisely to account for the risk that, "[d]ue to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive privacy."  S. Rep. No. 105-190, at 8.  On the district court's view, the DMCA would provide no protection at all against the "massive piracy" that was its main target.  *But see First Nat'l Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261 (1966) ("It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed . . . .").

28

Whatever its outer limits, the DMCA's safe harbor intended for "innocent service provider[s]" must, if it is to conform to the central purposes of the statute, exclude at least those that "welcome," and even intend, their users' infringement. *ALS Scan, Inc. v. RemarQ Communities, Inc*., 239 F.3d 619, 625 (4th Cir. 2001); *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578, 2009 WL 6355911, at *18 (C.D. Cal. Dec. 21, 2009) (DMCA safe harbors "are based on passive good faith conduct aimed at operating a legitimate internet business"). To conclude otherwise would fatally undermine Congress's intent to address "massive piracy." It would immunize even entities such as Grokster itself, which "distribute[d] a device with the object of promoting its use to infringe copyright," yet designed its system to avoid item- or location-specific knowledge of those infringements. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, 936 (2005).

The Supreme Court's decision in *Grokster* addresses the importance of intent in imposing contributory and inducement liability, concluding that a defendant that acts with unlawful *intent* may not escape liability merely because it does not— or even could not—know of each specific act of infringement fostered by its actions. *See* 545 U.S. at 922-23. The Court relied on settled common law to reach this conclusion, holding that culpable intent incurs liability "'on principles recognized in every part of the law.'" *Id.* at 935 (quoting *Kalem Co. v. Harper Bros.*, 222 U.S. 55, 62-63 (1911)).

29

"A party contending that legislative action changed settled law has the burden of showing that the legislature intended such a change." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 521 (1989). YouTube cannot make the requisite showing: Nothing in the DMCA safe harbor suggests that Congress intended to alter this well-established principle of liability in order to immunize service providers whose liability would not result from infringement necessarily occurring "[i]n the ordinary course of their operations," S. Rep. No. 105-190 at 8, but instead from infringement intentionally fostered. To the contrary, other district courts to have addressed the question have recognized that "if Defendants . . . encouraged or fostered . . . infringement, they would be ineligible for the DMCA's safe harbor provisions." *Arista Records LLC v. USENET.com, Inc.*, 633 F. Supp. 2d 124, 142 (S.D.N.Y. 2009). Indeed, service providers that induce infringement *a fortiori* have at the very least "[a]wareness of facts or circumstances from which infringement is apparent." Otherwise, Congress's narrow safe harbor would be converted into a haven for intentional piracy.

And that is a world in which copyright owners cannot long survive. The district court's interpretation effectively requires copyright holders to find and monitor the websites of intentional infringers constantly to identify infringing materials and send serial take-down notices as new instances of infringement are discovered. Such a rule encourages websites to place obstacles in copyright owners' way, as

30

the court suggests no obligation to make such searches and takedowns feasible. Only website owners have the ability to deploy automatic filters and to identify and block clips as they are loaded.  If, as the court concluded, it is difficult for YouTube to monitor content as it is being uploaded to the YouTube website, it is orders of magnitude more difficult for copyright owners to monitor YouTube, because they cannot search or apply automatic filters to newly uploaded clips and thus have to constantly monitor the entire site.  The consequences of the lower court's view would be to have every copyright owner search every site on the Internet, in every file format, regardless of impediments placed by website operators and to do so constantly regardless of any limitations that may be imposed by the site operator.

And because only the site operator can block material prior to posting or in a timely manner thereafter, the district court's approach, in essence, offers a license to infringers of the copyrights of popular culture at the moment in time when the intellectual property has its greatest value—when it is "hot."  JAII-173; *cf. Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 853 (2d Cir. 1997) (recognizing that courts protect "property rights in time-sensitive information" because otherwise "no one would have an incentive to collect 'hot news'").  If those that intentionally facilitate infringement can retain the safe harbor simply by responding to

31

DMCA take-down notices, the value of copyrights—especially those in works of popular culture—will be substantially diminished.

The cases on which the district court relied do not command, or even suggest, this untoward result. In *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007), for example, the defendants provided services to websites with addresses—such as "illegal.net" and "stolencelebritypics.com"—that the plaintiff argued gave notice to defendants of ongoing infringement. The Ninth Circuit concluded that the website names alone were insufficient to create awareness of infringement because "[w]hen a website traffics in pictures that are titillating by nature, describing photographs as 'illegal' or 'stolen' may be an attempt to increase their salacious appeal, rather than an admission that the photographs are actually illegal or stolen." *Id.* Even the crabbed construction of red flag awareness in the Ninth Circuit's analysis would not save YouTube, however, for, the service provider in *CCBill* was found to have no awareness that infringement was ongoing *at all*. *Id*. Here, in contrast, YouTube was well aware that massive infringement was occurring, *intended* it to occur, and made no attempt to remedy it.[3]

_____

[3] The district court seems to suggest that the Ninth Circuit's decision in *CCBill* requires a DMCA-compliant take-down notice to impart awareness of infringing activity in a service provider. That misreads *CCBill*, which held only that a copyright holder's communications to a service provider must comply with the statutory requirements for take-down notices before those notices will be

[Footnote continued on next page]

To secure the protection of the safe harbor, the DMCA requires service providers aware of infringement to take commercially reasonable steps to "[a]ct expeditiously to remove, or disable access to, the [infringing] material." 17 U.S.C. § 512(c)(1)(A)(iii).  Here, YouTube easily could have taken steps to end infringement during the upload process.  Viacom was unable to review YouTube's videos until *after* they appeared online, and unable to require YouTube to remove them completely even after sending a formal take-down notice.  YouTube had fingerprint filtering technology and even its own community flagging feature available to it.  Its refusals to use those technologies—indeed, to disable or selectively deploy them—could not possibly be construed as actions consistent with an obligation of "expeditious[] . . . remov[al]." *Id.* § 512(c)(1)(A)(iii).

Under the correct interpretation of the awareness exclusion, Viacom—not YouTube—is entitled to summary judgment.  Although the safe harbor does not require a service provider to "monitor its service or affirmatively seek facts indicating infringing activity," S. Rep. No. 105-190, at 44, it will lose immunity "if it fails to take action with regard to infringing material when it is 'aware of facts or

---

[Footnote continued from previous page]

"deemed to impart such awareness." *CCBill* did not hold—or even suggest— that a service provider could not develop such awareness on its own, as YouTube unmistakably did here.  The view suggested by the district court would "allo[w] the service provider to 'turn a blind eye' to infringements . . . ." *Ginsburg*, Sony *Sheep*, 50 Ariz. L. Rev. at 598.

circumstances from which infringing activity is apparent.'" *CCBill*, 488 F.3d at 1114 (quoting 17 U.S.C. § 512(c)(1)(A)(ii)).

Given the undisputed evidence—the words of YouTube's own founder—that "blatantly illegal" infringement was rampant on YouTube's site, as well as the evidence that YouTube surveyed many specific infringements and that one of its founders even *posted* infringing material, there can be no genuine dispute of fact that YouTube knew—as any reasonable entity in its position would have—that infringement was ongoing.  JAII-183; *see also supra* pp. 8-17.  Accordingly, Viacom is entitled to summary judgment that the DMCA safe harbor is inapplicable.

### 2.  YouTube's Willful Blindness To Its Users' Acts of Infringement Satisfies Even The District Court's Erroneous Requirement Of URL-Specific Knowledge

Even if, as the district court held, Section 512(c) excluded from the statutory safe harbor only those service providers who have URL-specific knowledge of infringement, the district court erred by awarding summary judgment to YouTube despite Viacom's evidence that YouTube was willfully blind to that knowledge.  It is well-settled that "[w]illful blindness is knowledge in copyright law . . . as it is in the law generally."  *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003), *cited with approval in Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010).  Indeed, this Court confirmed just this year that "[a] service provider is not . . . permitted willful blindness," and that "[w]hen it has reason

to suspect that users of its service are infringing . . . it may not shield itself from learning of the particular infringing transactions by looking the other way." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109 (2d Cir. 2010).

"The principle that willful blindness is tantamount to knowledge is hardly novel." *Tiffany*, 600 F.3d at 110 n.16 (citing cases). A person is "willfully blind" or engages in "deliberate avoidance" amounting to knowledge where "the circumstances were such as to alert [the person] to a high probability" of the relevant fact, but the defendant "consciously avoided learning" that fact. *United States v. Aina-Marshall*, 336 F.3d 167, 170, 171 (2d Cir. 2003) (internal quotation marks omitted); *see also Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir. 1992) ("To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate."). This Court does not permit a service provider to escape liability simply by closing its eyes to the knowledge that would make it culpable, but will decline to find willful blindness when the defendant "was continually taking steps to further refine its anti-fraud measures" and "implemented the additional anti-fraud measures that [plaintiff] sought as soon as it was reasonably and technologically capable of doing so." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 514 (S.D.N.Y. 2008), *aff'd*, 600 F.3d 93 (2d Cir. 2010). But where "the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire

further out of fear of the result of the inquiry," willful blindness—and thus knowledge—has been established.  *Id.* at 515.

As the district court recognized, a jury easily could find that defendants "were generally aware of . . . copyright-infringing material being placed on their website."  SPA9.  But YouTube did not simply fail to investigate that obvious infringing activity.  Even more culpably, YouTube took affirmative steps to shut down any mechanism that might have provided the URL-specific knowledge YouTube claims is indispensable.

For example, in September 2005, YouTube instituted "community flagging," which permitted any user to flag a video as copyrighted or otherwise inappropriate, such as for sexual content or violence, with the click of a button.  As YouTube later described community flagging, its "army of content reviewers" would "aggressively monitor these submissions and respond as quickly as we can," including by removing flagged videos found to violate YouTube's policies.  JAI-271; JAII-208.  But less than two weeks after trumpeting the arrival of video flagging, one of YouTube's founders emailed his colleagues and asked, "can we remove the flagging link for 'copyrighted' today?"  JAII-177.  His reasoning was that "it's actually better if we don't have the link there at all because then the copyright holder is responsible for serving us notice of the material and not the users." *Id*.

36

YouTube immediately discontinued flagging for copyrighted material, while retaining it for other inappropriate content, which community flagging continues to remove with great efficiency.  JAI-270-71

YouTube likewise consciously blinded itself to URL-specific knowledge of infringement by choosing to implement—but only selectively—commercially available digital fingerprint filtering technology.  Had YouTube used Audible Magic in a nondiscriminatory fashion, it would have scanned videos as they were uploaded to YouTube, instantaneously compared the unique digital identifier of the uploaded file to a database of copyrighted works, and in the event of a match, either automatically blocked the upload or flagged the video for further investigation.  But even though the MPAA had offered to reimburse YouTube for the cost of testing this technology, JAII-270-73; JAII-640-41, YouTube deployed Audible Magic only for those copyright owners that agreed to give YouTube a license.  YouTube finally admitted that it otherwise had no interest in utilizing or testing digital fingerprint filtering technologies because "the copyrighted content on YouTube [is] a major lure for [YouTube's] users."  JAII-634.  Thus, even when a Google executive indicated that the system was "live," he specified that it would "only [be] offered to partners who enter into a revenue deal with us."  JAI-817.

Although the district court cited this Court's decision in *Tiffany*, in which eBay's absence of willful blindness was outcome-determinative, it did not address

Viacom's argument that YouTube's willful blindness establishes its knowledge of infringement. The district court did briefly cite Section 512(m) for the proposition that the safe harbor does not require a service provider to "affirmatively seek[] facts indicating infringing activity." SPA19. But nothing in the text or history of the DMCA suggests that Section 512(m) was intended to repeal the common law of willful blindness and immunize those that fail to investigate even when confronted with facts suggesting a very high probability of unlawful activity. To the contrary, "section 512(m)'s dispensation of service providers from 'affirmatively seeking facts indicating infringing activity', should not entitle the service provider to passive-aggressive ignorance." Ginsburg, *User-Generated Content Sites*, *supra* n.2, at 193.

In fact, the very legislative history on which the district court relied states that, although "a service provider need not monitor its service or affirmatively seek facts indicating infringing activity . . . if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the limitation of liability if it takes no action." H.R. Rep. No. 105-551(II), at 53 (cited at SPA19). Thus, YouTube cannot take affirmative steps to deprive itself of item-specific knowledge, and then claim that its lack of such knowledge entitles it to the protection of the DMCA safe harbor. That is precisely the type of "deliberate avoidance"

this Court has been at pains to reject. *Aina-Marshall*, 336 F.3d at 170 (internal quotation marks omitted).

Because the evidence here demonstrates beyond genuine dispute that YouTube was at least willfully blind to the specific knowledge it claims to have lacked, Viacom, not YouTube, is entitled to summary judgment on You-Tube's safe harbor defense.

### 3. Viacom Presented Evidence Sufficient To Raise A Genuine Question Of Fact That YouTube Had Actual Knowledge Of Identifiable Infringements

Moreover, Viacom presented evidence well more than sufficient to create a genuine question of fact whether YouTube had the URL-specific knowledge that the district court asserted is required.

Knowledge "can often be proved through circumstantial evidence and the reasonable inferences drawn therefrom." *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005). Here, even the subset of YouTube's communications that Viacom was able to obtain after YouTube founders Hurley and Chen and Google CEO Schmidt claimed to have virtually no responsive documents demonstrates that at various times YouTube's managers and agents surveyed their website to determine the prevalence of copyrighted material. *See, e.g.*, JAII-47; JAII-159-60. Before Google acquired YouTube, its agents estimated the percentage of views that were of infringing material. JAII-228. In March 2006, one of the founders

39

distributed a memorandum to the Board of Directors indicating that they were aware of "blatantly illegal" infringement as to a list of well-known Viacom shows. JAII-183.

There is at least a triable question of fact as to whether these persons could have concluded that 70 percent of the most-viewed videos were copyrighted, or that 60 percent of all views were of copyrighted material, or that numerous Viacom-owned programs were on YouTube, without examining the YouTube site and identifying certain materials, including Viacom-owned materials, as copyrighted. That exercise necessarily would have revealed "the works' locations at the site." SPA32.  Yet YouTube did nothing.  Summary judgment for YouTube accordingly is inappropriate.

## B.   YouTube's Profiteering From Its Users' Infringement Is Not Protected By The DMCA

Separate and apart from the requirement that a service provider have no knowledge or awareness of its users' infringements, Section 512(c)(1)(B) of the DMCA requires that a defendant seeking safe harbor protection must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  In its brief analysis of Section 512(c)(1)(B), the district court did not decide whether YouTube had received financial benefits attributable to its users' infringing activity, but concluded that YouTube lacked the "right and ability to control"

40

that activity.  It held that, as a matter of law, the "ability to control" infringing activity requires proof at the outset that the service provider have "item-specific" knowledge of that activity.   SPA28-29.   That novel interpretation of Section 512(c)(1)(B) has no support in logic or in law and independently requires reversal.

As a logical matter, the district court was simply wrong when it stated that the "ability to control" infringing activity requires item-specific, location-specific knowledge of its users' infringements apart from the knowledge gained when the control is actually implemented.  YouTube obviously had the "ability" to control users' infringement by implementing Audible Magic filtering, which was amply demonstrated when the fingerprint filtering system was selectively deployed.  Exercising that "ability" to control infringement did not require anything heroic of YouTube.  It just required it to make use of the tools already at its disposal.

The district court's interpretation also is incompatible with the structure of Section 512(c) because it makes Section 512(c)(1)(B)'s exclusion of service providers that obtain financial benefits from infringing activity they have the right and ability to control entirely duplicative of Section 512(c)(1)(A).  Any service provider that has item-specific knowledge of users' acts of infringement and obtains financial benefits from them already would be excluded from the safe harbor by Section 512(c)(1)(A) for having failed to act to remove the infringing material of which it had knowledge.  No additional service provider would be excluded by

Section 512(c)(1)(B).  The district court's interpretation of Section 512(c)(1)(B) thus makes consideration of the provision entirely unnecessary.  Such redundancy should not be ascribed unnecessarily to an Act of Congress.  *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

But no such disfavored ascription is necessary here because Congress did not pull the test incorporated into Section 512(c)(1)(B) out of the ether.  Rather, the statutory language tracks precisely the common law rule that a defendant may be vicariously liable for copyright infringement when that defendant "derive[s] a direct financial benefit from the infringement and ha[s] the right and ability to supervise the infringing activity."  *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004); *see also Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 710 (2d Cir. 1998).  And the legislative history confirms that the statutory language was intended to codify the common law requirements.  H.R. Rep. No. 105-551(I), at 25-26.[4]  Where, as here, "Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."

---

[4] This report discussed an earlier version of the bill, but the language at issue is identical to the enacted version.

42

*Neder v. United States*, 527 U.S. 1, 21 (1999) (internal quotation marks and altera-tion omitted).  Several courts accordingly have recognized that the plain text of Section 512(c)(1)(B) codifies the common-law standards for vicarious liability. *See, e.g.*, *CCBill*, 488 F.3d at 1117; *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 704 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004); 3 *Nimmer on Copyright* § 12B.04[A][2], at 12B-38 (2001).

It is well-established that vicarious liability for copyright infringement does not require "item-specific" knowledge.  Rather, vicarious liability turns on finan-cial benefit and control, "even in the absence of actual knowledge that the copy-right monopoly is being impaired."  *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963); *see also Grokster*, 545 U.S. at 930 n.9 ("vicari-ous liability . . . allows imposition of liability . . . even if the defendant initially lacks knowledge of the infringement"); *USENET.com*, 633 F. Supp. 2d at 156 ("[V]icarious liability is premised wholly on direct financial benefit and the right and ability to control infringement; it does not include an element of knowledge or intent on the part of the vicarious infringer.").

Applying the correct legal standard—that of common law copyright vicari-ous liability—YouTube clearly meets the requirements for exclusion from the safe harbor.

*First*, it cannot be seriously disputed that YouTube had the *right* to control the rampant infringing activity on its site:  Soon after YouTube launched, its Terms of Use stated that "YouTube does not permit copyright infringing activities," "will remove all Content" that "infringes on another's intellectual property rights," and otherwise "reserves the right to remove Content and User Submissions without prior notice."  JAIV-167.  YouTube further assumes editorial control over the site by reserving and exercising the right to terminate user accounts or remove "content at [its] sole discretion for any reason whatsoever," authority that it routinely exercises by removing erotic and violent videos.  JAI-318; *see also* JAI-271; JAI-317. For purposes of vicarious liability, "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise."  *A&M Records Inc. v. Napster*, 239 F.3d 1004, 1023 (9th Cir. 2001).

*Second*, the undisputed evidence amply demonstrates that YouTube had the *ability* to control infringement; it just chose not to exercise it.  As addressed above, YouTube briefly implemented "community flagging" as a means of identifying and removing copyrighted content, but chose to disable the feature when it became concerned that its community flagging might constitute notice of infringement.  *See supra* pp. 12-13.  YouTube also had the ability to find infringing clips by searching for keywords associated with copyrighted content (*e.g.* "South

44

Park") using YouTube's own search feature and index, as YouTube officials evidently did with some regularity as they examined the scope of infringing activity on the YouTube site. *See, e.g.*, JAII-183; JAI-857. Even if such searches would not have uncovered *all* of the infringing works, YouTube could easily have discovered and removed the massive quantities of infringing videos that would have turned up in response to such searches.[5]

But most tellingly, YouTube had the ability to forestall virtually all infringing activity during the upload process through the use of commercially available fingerprint filtering technology such as that offered by Audible Magic. Although this technology was in widespread commercial use at the time of YouTube's founding, YouTube did not deploy it to block content until 2007. *See supra* pp. 13-14, 16. Even then, YouTube selectively deployed this powerful protection only for "a handful of partners" who had granted YouTube a content license and revenue sharing deal. JAII-673. Only in 2008, long after this litigation began, did YouTube finally use the technology it had in hand to filter Viacom's intellectual property from its site. Under any reasonable construction of the word "abil-

---

[5] YouTube's ability to control the infringing material was not limited by its purported inability to distinguish authorized from unauthorized videos protected by Viacom copyrights. As addressed *supra* note 2, Viacom offered to work with YouTube to ensure that it knew precisely which clips were authorized. JAII-192-94; JAII-634.

ity," this selective deployment of highly-effective fingerprint filtering technology establishes that YouTube had the "ability to control" its users' infringement of Viacom's copyrighted creations.

Section 512(m)(1) of the DMCA does not disable YouTube from controlling its users' infringement. Section 512(m)—entitled "Protection of Privacy"— provides that application of the safe harbor of Section 512(c) shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." This narrow provision, which protects users' privacy by negating any requirement to monitor an individual's materials stored for their own use, was not intended to render ineffectual the safe harbor's exclusion of those financially benefitting from infringing activity which they had the ability to control.

In any event, recognizing that YouTube had the right and ability to control the infringement that it intentionally facilitated would not require innocent providers to make affirmative efforts to seek out infringement as a condition of Section 512(c)'s safe harbor. Instead, when combined with the remainder of Section 512(c), that interpretation requires only those service providers who financially benefit from ongoing infringement of which they have knowledge or awareness— not the innocent—to take commercially reasonable steps to prevent that infringement. Section 512(m) simply excuses those providers who, unlike YouTube, are

46

unaware of ongoing infringement and do not profit from it from actively seeking out infringing material.

If Section 512(m) were interpreted to permit service providers who profit from infringement to claim the safe harbor without exercising their right and ability to control the infringement, then the exclusion of Section 512(c)(1)(B) would capture no one. But it is axiomatic that one provision of a statute must not be construed in a manner that negates another provision of the same statute. *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 217-18 (2001). Accordingly, Section 512(m) should be interpreted to relieve innocent service providers of the obligation to investigate to determine whether infringement is ongoing, but not to permit an intentional enabler of infringement to profit from that infringement.

*Finally*, undisputed evidence demonstrates that YouTube obtained "a financial benefit directly attributable" to its user's infringement. Courts will find such a direct financial benefit where infringing material is a "draw" for customers. *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996); *Shapiro*, 316 F.2d at 307 (liability where infringement provided "source of customers and enhanced income"). In *A&M Records, Inc. v. Napster, Inc.*, for example, the Ninth Circuit concluded that plaintiffs were likely to succeed in demonstrating a direct financial interest where "[m]ore users register with the Napster system as the quality and quantity of available music increase[d]" and "future

revenue [was] directly dependent upon increases in userbase." 239 F.3d 1004, 1023 (9th Cir. 2001) (internal quotation marks omitted); *see also Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 517-18 (S.D.N.Y. 2010) (holding that the defendant possessed a direct financial interest in users' infringing activity where it profited from its ability to attract infringing users, including through increased advertising revenue).

Here, there can be no debate that infringing material was a "draw" for the YouTube audience. YouTube's own general counsel called it a "major lure." JAII-634. After rapidly building YouTube's audience with infringing content, the founders cashed in on YouTube's popularity, selling YouTube to Google for $1.65 billion just a year and a half after it was founded. JAI-258-59. Moreover, until January 2007, YouTube profited directly from copyright infringement by placing ads on the pages where a user viewed infringing clips ("watch page")—a practice ultimately discontinued for "legal reasons." JAI-310-12; JAI-792. Even after YouTube removed advertisements from watch pages, it continued to profit from users drawn to the site by infringing material by selling advertising space on YouTube's home, search, browse, and upload pages. JAI-312-16. By increasing the traffic on these pages, the infringing material provided a direct financial benefit to YouTube.

In short, the evidence demonstrates that YouTube "[t]urn[ed] a blind eye to detectable acts of infringement for the sake of profit." *Napster*, 239 F.3d at 1023. At a minimum, the evidence adduced by Viacom is sufficient to create a genuine question of fact as to whether YouTube had obtained a "financial benefit directly attributable to the infringing activity" that it had "the right and ability to control." 17 U.S.C. § 512(c)(1)(B). For that reason alone, the award of summary judgment to YouTube must be reversed.

### C.   YouTube's Performance And Licensing Of User-Uploaded Copyrighted Content Are Not The Type Of Storage Activities That The DMCA Immunizes From Liability

The district court's award of summary judgment must be reversed for a third reason: Section 512(c)'s safe harbor is limited to claims of infringement "by reason of the storage at the direction of a user." 17 U.S.C. § 512(c)(1). The legislative history of the provision confirms that a service provider offers "storage" services when it provides "server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users." H.R. Rep. No. 105-551(II), at 53. But the text and structure of the DMCA make just as clear that Section 512(c) "does not suspend liability for other [non-storage] acts in which the service provider might engage with respect to the user-posted content." Ginsburg, Sony *Sheep*, 50 Ariz. L. Rev. at 594-95 (citing *Costar Group*, 164 F. Supp. 2d 688).

Congress adopted the DMCA safe harbor to protect passive providers of storage because the very nature of computerized businesses could lead to direct infringement liability that would not arise from comparable conduct in the offline world. *See* S. Rep. No. 105-190, at 8 ("In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make . . . electronic copies . . . in order to host World Wide Web sites"). But Congress did not intend to give content-based entertainment enterprises an unfair advantage over traditional media merely because they operate on the Internet. As the Ninth Circuit cautioned about another limited Internet immunity, the Internet's "vast reach into the lives of millions is exactly why we must be careful not to exceed the scope of the immunity provided by Congress and thus give online businesses an unfair advantage over their real-world counterparts, which must comply with laws of general applicability." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 n.15 (9th Cir. 2008) (en banc).

YouTube is an integrated media business that "compare[es] [it]sel[f] to, say, abc/fox/whatever," JAI-856, operating over a website (www.youtube.com) and other distribution platforms such as mobile phones. Viacom's claims of infringement have nothing to do with "storage," much less "storage at the direction of a user."

50

Consistent with its slogan—Broadcast Yourself—YouTube transcodes user-uploaded material into a standard format for display, distribution, and performance of the content on its website and third-party platforms.  The reason YouTube does this is *not* to facilitate storage, but to facilitate activities that are necessary for wide public dissemination of the works (*i.e.*, broadcasting).  And these activities are ones that YouTube's longest-serving engineer testified are performed "as a course of its normal operation . . . *uninstructed by the user.*"  JAI-331 (alteration in original) (emphasis added).

Once a user finds the video he or she is interested in viewing, he or she can view it by visiting a "watch" page on YouTube's site and playing it with the embedded video player.  This delivers the data comprising the video to the user's computer.  This playback activity certainly is not "storage," and though it may occur at the direction of a user, it very rarely is the same user who originally uploaded the video.

When a user has finished watching an infringing video, YouTube will automatically search its indexed video library and suggest similar videos for additional viewing, (*e.g.*, if a viewer watches a clip from *The Colbert Report*, thumbnails of other *The Colbert Report* episodes will appear), encouraging the user to commit new acts of copyright infringement.  This inducement of infringement is not remotely related to storage and it occurs at YouTube's impetus, not the user's.

51

Finally, YouTube goes so far as to *license* the copyrighted material uploaded to its website to *third parties*. For example, in March 2007, without consulting users, YouTube reformatted the videos on its website—including millions of infringing videos—into a format that could be viewed by users on mobile devices. JAIII-500-02. In the early stages of YouTube's mobile version, it "syndicated" videos to Verizon Wireless and other companies. JAIII-500. There is no conceivable construction of the word "storage" that could embrace unauthorized licensures of copyrighted material to third parties and further transcoding for the purpose of broad public dissemination. And these business transactions obviously do not occur at the "direction of a user."

Without analyzing the nature of Viacom's particular claims of infringement, the district court improbably concluded that *all* of them are subject to a safe harbor defense that by its terms extends only to infringement "by reason of the storage at the direction of a user." SPA26. To do so, the district court construed the statutory phrase "by reason of the storage" to embrace any claim that "flow[s] from the material's placement on the provider's system." SPA27. Any interpretation that excluded what the district court described as the "collateral scope of 'storage' and allied functions"—a penumbra that apparently swept over even YouTube's licensure of copyrighted works to third parties—was "too narrow[] to meet the statute's purpose" and, indeed, was "inconceivable." SPA26-28.

The district court's endlessly malleable construction of "by reason of" should be rejected.

A construction of "by reason of" to mean merely "as a result of" or "can be attributed to" cannot be reconciled with the Supreme Court's interpretation of the identical phrase in other statutes.  SPA27 (internal quotation marks omitted).  In those contexts, the Supreme Court repeatedly and consistently has explained that the statutory phrase "by reason of" requires a finding of not merely but-for causation (*i.e.*, "flow[ing] from" an event), but *proximate causation*.  *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 263-64 (1992); *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) (explaining that the question of whether the injury was caused "by reason of" the defendant's actions, required the court "to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them").

Moreover, the district court's construction of "by reason of" to include "collateral" functions is at odds with the Ninth Circuit's interpretation of the same language.  That court recognized that under Section 512, the "majority . . . of functions . . . remain outside of the safe harbor."  *CCBill*, 488 F.3d at 1117.  Thus it construed the identical phrase, "by reason of," in Section 512(d) to reach only "infringe[ment that occurs] by providing a hyperlink" and not to provide "blanket immunity for . . . other services."  *Id*.

53

Finally, this narrow reading is consistent with the structure of Section 512, which provides several narrow limitations on liability, and with Section 512(n), which provides that each of the limitations is "separate and distinct." To nonetheless read Section 512(c) so broadly as to safeguard any functions even tangentially-related to storage would impermissibly give Section 512(c) a scope far exceeding that of the parallel statutory provisions in Sections 512(a), (b), and (d).

Viacom has presented ample evidence that YouTube engaged in infringing activity that is wholly separate from its activities related to providing user-directed storage. A user's decision to upload video content to the YouTube website is not "direction" to (1) make multiple copies of the content for easy viewing across different electronic formats; (2) index and feature the material in a manner that encourages other users to view the "stored" material; or (3) license the material to third parties such as Verizon Wireless so that the content may be easily watched on mobile devices. YouTube independently takes those actions for its own benefit and profit. As a result, these activities do not qualify for protection under Section 512(c). The district court committed legal error when it found to the contrary, and that error requires reversal of the district court's award of summary judgment to YouTube.

## II. Viacom Is Entitled To Summary Judgment On Its Affirmative Claims

Because the court below disposed of the case under the DMCA, it denied Viacom's motion for summary judgment on its *Grokster* claim for intentional facilitation of infringement on YouTube and on its direct infringement and vicarious liability claims. This Court reviews the district court's denial of summary judgment de novo. *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 165 (2d Cir. 2000), *aff'd*, 533 U.S. 483 (2001). The facts of YouTube's conduct are essentially undisputed. Once the DMCA is properly construed, these undisputed facts, which demonstrate that the safe harbor is inapplicable, likewise entitle Viacom to judgment on its affirmative claims. Because the relevant facts are uncontested, Viacom's motion on its affirmative claims presents an issue of law that this Court may decide as readily as the district court.

### A.    Viacom Is Entitled To Summary Judgment On Its Direct Infringement Claim

As the owner of the copyright, Viacom has the "exclusive right" to "reproduce," "display," "perform," or "distribute" its copyrighted work. 17 U.S.C. § 106. Yet this is precisely what YouTube and its users do: When a user uploads a video onto YouTube's "online video community," YouTube transcodes (*i.e.*, reproduces) it into multiple formats for viewing on various media platforms; it displays the video on its website www.youtube.com; when a user presses "play" on

55

YouTube's embedded video player, the player performs the video; and, when it suits YouTube, YouTube distributes the video to third parties.

This all is perfectly legal when a user uploads videos he or she created. But YouTube takes these actions with respect to copyrighted videos to which it has no rights. Accordingly, YouTube does not merely enable its users to infringe; it also engages in widespread copyright infringement itself. When a user submits a video to YouTube, YouTube makes a copy of the video in its original format, as well as one or more additional copies during the upload process in a different format called Flash so that the video can be viewed by the public. JAI-330. As You-Tube's longest-employed engineer testified, "[t]he system performed . . . the replication as a course of its normal operation, . . . uninstructed by the user." JAI-331 (alteration in original). YouTube also makes and sends "a replica" of particularly popular videos to a "content distribution partner to facilitate timely streaming to all users." *Id*. And, YouTube performs the infringing videos by streaming them on demand to the computers of millions of users. *Id*.

These acts of unauthorized reproduction, display, performance, and distribution constitute direct copyright infringement. 17 U.S.C. § 106. Indeed, YouTube's Terms of Service state its intention to engage in precisely these acts, as they provide that the user "grant[s] YouTube a worldwide, non-exclusive, royalty-free, sublicenseable and transferable license to use, reproduce, distribute, prepare de-

56

rivative works of, display, and perform" each uploaded video.  JAI-336 (alterations in original).  These undisputed facts indicate that YouTube is an "active participant[] in the process of copyright infringement."  *USENET.com*, 633 F. Supp. 2d at 148 (internal quotation marks omitted).  Accordingly, YouTube's actions amply satisfy the "volitional conduct" standard this Court has imposed on direct infringement claims.  *See Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130-31 (2d Cir. 2008), *cert. denied*, 129 S. Ct. 985 (2009); *cf. Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1368-69 (N.D. Cal. 1995).  As such, Viacom is entitled to summary judgment on its direct infringement claim.

### B.    Viacom Is Entitled To Summary Judgment On Its *Grokster* Claim For Intentional Facilitation Of Infringement

*Grokster* liability is predicated on the intentional facilitation of infringement. A *Grokster* claim requires (1) intent to bring about infringement; (2) distribution of a device or offering of a service suitable for infringing use; and (3) evidence of actual infringement by users of the device or service.  545 U.S. at 940.  No one contests that the second and third elements are met in this case:  Defendants offered the YouTube service which is suitable for infringing use, and actual infringement in fact occurred on YouTube on a massive scale.  Hence, as in many *Grokster* cases, YouTube could conceivably dispute only the first element: whether Defendants *intended* to bring about this infringement by operating YouTube.  *See, e.g.*,

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006); *Lime Group*, 715 F. Supp. 2d at 509.

Though intent is a question of fact ordinarily ill-suited for summary judgment, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "Indeed, the Supreme Court in *Grokster* all but explicitly instructed the district court to grant the plaintiffs' summary judgment motion, even where the central issue in an inducement claim is the defendant's intent to induce or foster infringement." *USENET.com*, 633 F. Supp. 2d at 154. Numerous courts, including two in this circuit, have entered summary judgment finding *Grokster* intent based on voluminous summary judgment records like that here. *See Lime Group*, 715 F. Supp. 2d at 508 (holding that plaintiffs were entitled to summary judgment because "[t]he evidence establishes that [defendant] . . . intentionally encouraged direct infringement"); *see also USENET.com*, 633 F. Supp. 2d at 150-54; *Fung*, 2009 WL 6355911, at *19; *Grokster*, 454 F. Supp. 2d at 992. Token assertions by Defendants that they did not intend to induce infringement cannot overcome this evidence. *See USENET.com*, 633 F. Supp. 2d at 154 ("Defendants have submitted testimony denying wrongful intent; yet, the facts speak for themselves, and paint a clear picture of Defendants' intent to foster infringement by their users").

Undisputed evidence demonstrates that YouTube intended to further in-fringement. YouTube's founders were well aware from their prior experience with PayPal that a payout in the hundreds of millions or even billions of dollars could result from rapid user growth. As a result, one of YouTube's founders urged his colleagues to "concentrate all of our efforts in building up our numbers as aggres-sively as we can through whatever tactics, however evil." JAI-832. YouTube then abandoned or declined to undertake reasonably available means of identifying and preventing infringement—*e.g.*, community flagging and fingerprint filtering—precisely because copyrighted material was a "major lure" for its users, JAII-634, conduct that the Supreme Court considered "particularly notable" evidence of unlawful purpose in *Grokster*. 545 U.S. at 939. *Grokster* also highlighted the de-fendants' significant financial incentive to encourage infringement—an incentive obviously present here. *Id.* at 939-40. And, YouTube intentionally indexed copy-righted material to which it knew it lacked any rights and displayed it as thumb-nails when users viewed related videos, directly encouraging those users to engage in further infringing activity.[6]

---

[6] *Grokster* specifically refutes that inducement liability requires communication of an express pro-infringement message to users. 545 U.S. at 938; *see also Grokster*, 454 F. Supp. 2d at 984.

Finally, although the district court assigned significance to Defendants' assertions that YouTube does not "exist[] solely to provide the site and facilities for copyright infringement," the existence of noninfringing material on YouTube does not alter the liability inquiry. In *Grokster*, the lower courts had found that the peer-to-peer services were immune from liability because they had "substantial noninfringing uses." In reversing, the Supreme Court did not disturb the finding of substantial noninfringing uses and assumed it was correct, holding instead that the existence of such substantial noninfringing uses is *not* a defense to intentional facilitation of copyright infringement. *Grokster*, 545 U.S. at 931-34.[7]

## C.    Viacom Is Entitled To Summary Judgment On Its Vicarious Liability Claim

Viacom is also entitled to summary judgment on its vicarious liability claim. As set forth above, vicarious liability, like the safe harbor exclusion of Section 512(c)(1)(B), applies when the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities," even if he has no actual knowledge of the infringement. *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *see also Fonovisa*,

---

[7] In any event, as in *Grokster*, during the relevant time period, the legitimate uses of YouTube's technology were dwarfed by the forbidden ones. *See Grokster*, 454 F. Supp. 2d at 985; JAII-47 ("probably 75-80% of our views come from copyrighted material").

76 F.3d at 261-64.  For the same reasons YouTube is excluded from the safe harbor by Section 512(c)(1)(B), it is vicariously liable for its users' infringement.

## CONCLUSION

YouTube indisputably was aware of massive infringement.  If it wished to remain in the safe harbor, it was obligated to take reasonable steps (no heroic acts required) to prevent further infringement.  YouTube had at its disposal its community flagging feature and Audible Magic's filtering software, but rather than use these tools to curtail the rampant infringement it had fostered, it disabled flagging and withheld filtering, "welcomed" the infringement and sought to *grow* it and profit from it.  The DMCA was not intended to reward this type of conduct.  It is Viacom not YouTube that is entitled to summary judgment.  The judgment of the district court should be reversed.

DATED:    December 3, 2010                    Respectfully submitted,

                                  /s/  Theodore B. Olson

Paul M. Smith                         Theodore B. Olson
William M. Hohengarten                Matthew D. McGill
Scott B. Wilkens                      GIBSON, DUNN & CRUTCHER LLP
Matthew S. Hellman                    1050 Connecticut Avenue, NW
JENNER & BLOCK LLP                    Washington, DC 20036
1099 New York Avenue, NW              (202) 955-8500
Washington, DC 20001
(202) 639-6000

Susan J. Kohlmann                     Stuart J. Baskin
JENNER & BLOCK LLP                    SHEARMAN & STERLING LLP
919 Third Avenue                      599 Lexington Avenue
New York, NY 10022                    New York, NY 10022
(212) 891-1600                        (212) 848-4000

**Federal Rules of Appellate Procedure Form 6.
Certificate of Compliance With Rule 32(a)**


Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements


1.  This brief complies with the type-volume limitation of Fed. R. App. P.
    32(a)(7)(B) because:

    X          this brief contains 13,880 words, excluding the
               parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii),
               *or*


    __         this brief uses a monospaced typeface and contains [***state the
               number of***] lines of text, excluding the parts of the brief ex
               empted by Fed. R. App. P. 32(a)(7)(B)(iii).


2.  This brief complies with the typeface requirements of Fed. R. App. P.
    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) be-
    cause:

    X          this brief has been prepared in a proportionally spaced typeface
               using **Microsoft Word 2003** in **14 point Times New Roman**,
               *or*


    __         this brief has been prepared in a monospaced typeface using
               [***state name and version of word processing program***] with
               [***state number of characters per inch and name of type style***].

(s)                /s/ Theodore B. Olson

Attorney for       Plaintiffs-Appellants

Dated:             December 3, 2010

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of December, 2010, a true and correct copy of the foregoing Plaintiffs-Appellants' Opening Brief was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1 (h)(1) & (2).

/s/ Theodore B. Olson

Theodore B. Olson

Max W. Berger
John C. Browne
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

Charles S. Sims
William M. Hart
Noah Siskind Gitterman
Elizabeth A. Figueira
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
(212) 969-3000

*Attorneys for Appellants The Football Ass'n Premier League Ltd., et al.* (10-3342)

Andrew H. Schapiro
A. John P. Mancini
Brian M. Willen
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

David H. Kramer
Michael H. Rubin
Bart E. Volkmer
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304
(650) 493-9300

*Attorneys for Appellees*